## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| United States of America,<br><br>     Plaintiff;<br><br>  v.<br><br>Alamance County, *et al.*,<br><br>     Defendants. | No. 11-cv-507<br><br>UNITED STATES' MEMORANDUM IN SUPPORT OF ITS UNOPPOSED MOTION TO DISMISS THE AMENDED COMPLAINT AS MOOT |

# EXHIBIT A



**U. S. Department of Justice**

Civil Rights Division

_Assistant Attorney General_                           _Washington, D.C. 20530_

September 18, 2012

**VIA EMAIL AND FEDERAL EXPRESS**

Clyde B. Albright
County Attorney
Legal Department, Alamance County
124 West Elm Street
Graham, North Carolina 27253

Chuck Kitchen
Turrentine Law Firm
920-B Paverstone Dr
Raleigh, North Carolina 27615

      Re:    <u>United States' Investigation of the Alamance County Sheriff's Office</u>

Dear Mr. Albright and Mr. Kitchen:

      The Civil Rights Division ("Division") has concluded its investigation into allegations of civil rights violations by the Alamance County Sheriff's Office ("ACSO"). We find that ACSO has engaged in a pattern or practice of violations of the United States Constitution and federal law. Our investigation focused on ACSO's compliance with the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and the regulations implementing Title VI, 28 C.F.R. §§ 42.101-42.112. Section 14141 prohibits law enforcement agencies, such as ACSO, from engaging in a pattern or practice of violating the Constitution or laws of the United States. Title VI and its implementing regulpations prohibit recipients of federal financial assistance, such as ACSO, from discriminating on the basis of race, color, or national origin.

      In June 2010, we notified Alamance County and Sheriff Terry S. Johnson of our investigation into allegations of discriminatory policing and unconstitutional searches and seizures. While law enforcement agencies typically cooperate with our investigations, ACSO and Alamance County have persistently delayed providing important information and otherwise obstructed the Division's investigation. ACSO and the County failed to provide requested records and documentary evidence for months and refused to permit attorneys for the United States to interview current and former ACSO personnel outside the presence of counsel. The Division sought private interviews because numerous current and former officers expressed fear

that Sheriff Johnson or other County or ACSO officials would retaliate against them if they cooperated with the investigation. After repeated attempts to resolve this dispute short of litigation, the Division filed a declaratory judgment action in June 2011 to secure a court order that such interviews were consistent with the North Carolina Rules of Professional Conduct.[1]

Despite the lack of cooperation from ACSO and Alamance County, the Division has now gathered sufficient information about ACSO's practices to make these findings. During the investigation, aided by leading experts on police practices and statistical analysis, we reviewed ACSO policies, procedures, training materials, data on traffic stops, arrests, citations, and vehicle checkpoints, and other documentary evidence. We also interviewed over 125 individuals, including County residents and current and former ACSO employees.[2]

We find reasonable cause to believe that ACSO engages in a pattern or practice of unconstitutional policing. Specifically, we find that ACSO - through the actions of its deputies, supervisors, and command staff - unlawfully targets, stops, detains, and arrests Latinos. These actions violate the Fourth and Fourteenth Amendments, Section 14141, Title VI, and the Department of Justice's ("DOJ") regulations implementing Title VI.

Effective resolution of this matter will require the development of a comprehensive written agreement involving sustainable remedies and federal judicial oversight. We believe that it is in the mutual interest of the United States, ACSO, and the people of Alamance County to resolve this matter without litigation. If you wish to discuss a negotiated settlement, we are prepared to begin discussions immediately. Please advise us by September 30 if ACSO is interested in entering into negotiations.

Constitutional policing and effective law enforcement go hand-in-hand. The pattern or practice of discrimination that we find erodes public confidence, creates distrust between police and segments of the community, and inhibits the reporting of crime and cooperation in criminal investigations. Biased policing makes the job of police officers harder, not easier. The United States urges ACSO to work together with us to develop durable and comprehensive remedies that improve public safety, the safety of officers, and make the job of law enforcement more effective. If you are unwilling to do so, we will not hesitate to take appropriate action.

## SUMMARY OF FINDINGS

Based on our careful review of the evidence, we have concluded that ACSO engages in a pattern or practice of discriminatory policing against Latinos. The discriminatory conduct we observed is deeply rooted in a culture that begins with Sheriff Johnson and permeates the entire agency.

---

[1] Because we have been able to gather sufficient evidence to make these findings without additional interviews of ACSO personnel, we are contemporaneously withdrawing this lawsuit.

[2] Federal law prohibits ACSO from intimidating, threatening, coercing, or engaging in other retaliatory or discriminatory conduct, or attempting to do the same, against anyone because he or she has cooperated with our investigation or has taken any action or participated in any action to secure rights protected by the civil rights laws. *See* 18 U.S.C. § 1512.

Our factual findings of discriminatory policing include the following:

- A recent statistical study commissioned by DOJ found that ACSO deputies are between four to ten times more likely to stop Latino drivers than non-Latino drivers.

- Individual accounts of vehicle checkpoints and conduct during traffic stops corroborate ACSO's discriminatory enforcement activities, including locating checkpoints in predominantly Latino neighborhoods and treating stopped drivers differently based on their ethnicity.

- ACSO's booking practices, including practices related to immigration status checks, discriminate against Latinos. Individual accounts confirm that ACSO improperly detains Latinos for immigration enforcement purposes after they have posted bond.

- ACSO's discriminatory activities are intentional and motivated by the Sheriff's prejudices against Latinos. The Sheriff and others in ACSO's leadership have explicitly instructed deputies to target Latinos for checkpoints and arrests, and have made statements that reveal a discriminatory bias against Latinos.

- ACSO's departures from state law and policing standards in reporting and monitoring its activities mask ACSO's discriminatory conduct and inhibit proper monitoring of traffic enforcement activity and racial profiling.

Our factual findings support the following legal determinations:

- ACSO discriminates against Latinos by engaging in a pattern or practice of conduct that violates the Equal Protection Clause of the Fourteenth Amendment, Section 14141, Title VI, and the Department's Title VI implementing regulations.

- ACSO engages in a pattern or practice of unlawful seizures, including unjustified stops of Latinos in violation of the Fourth Amendment and Section 14141.

## BACKGROUND

Alamance County, North Carolina, is located in the central Piedmont region of the state. The County has approximately 151,000 residents, of whom 71.1% are white, 18.8% are African American, and 11.0% are Latino or Hispanic.[3] Alamance County's Latino population has grown rapidly over the last two decades, from a population of only 736 individuals in 1990 to 16,624 individuals by the 2010 Census.[4] ACSO is the largest of eight local law enforcement agencies

---

[3] U.S. Census Bureau, Alamance County, 2010 Demographic Data,
http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last visited Sept. 11, 2012).
[4] *Id.*

operating within the County. As of 2010, there were 123 full-time sworn officers at ACSO,[5] fewer than a dozen of whom identified as members of a minority group. Another 147 employees were full-time civilian employees, including correctional officers.[6]

## FACTUAL FINDINGS

We find that ACSO deputies, supervisors, and command staff, including Sheriff Johnson, engage in a pattern or practice of discriminatory policing against Latinos. Sheriff Johnson both directs this discrimination and fosters it by promoting a culture of bias within ACSO. This pattern is manifest in a range of conduct that is described more fully below.

### A. Discriminatory Practices

Since at least 2007, ACSO has targeted Latinos in Alamance County for heightened enforcement activity. This activity includes disproportionately targeting Latinos for traffic enforcement, positioning vehicle checkpoints in Latino neighborhoods, and detaining Latinos in jail after there is no basis to do so. ACSO policies and practices deny Latinos equal protection of the law, erode public confidence in law enforcement, and diminish ACSO's capacity to protect public safety for all County residents.

*First, ACSO targets Latinos for traffic stops.* A statistical analysis of ACSO traffic stops demonstrates that ACSO's traffic enforcement practices have a significantly discriminatory impact on Latino drivers. Indeed, statistical analysis comparing ACSO's traffic stop data to all violators on several County roadways found that, depending on the road analyzed, ACSO deputies are anywhere between four to ten times more likely to stop Latino drivers than non-Latino drivers. These results show a discriminatory impact at least as great as any previously seen in the United States. In addition to this statistical evidence, the Division's interviews with deputies and community members provide additional evidence of discriminatory traffic stops. Many of these stops involved drivers cited only for driving without a license, an offense not observable from the road. In one reported incident, an ACSO deputy said he stopped a Latino man because "most of them drive without licenses."

*Second, ACSO targets Latinos with vehicle checkpoints.* Sheriff Johnson selects, and encourages his officers to select, predominantly Latino neighborhoods to set up vehicle checkpoints. These checkpoint locations are often positioned to target only the residents of these predominantly Latino communities, as they are stationed at or near the only entrances and exits of these neighborhoods. Although we learned that deputies often establish checkpoints without receiving the required prior approval from a supervisor and without creating any record of the checkpoint, both documented checkpoints and interviews confirm that ACSO checkpoints cluster at or near the entrances of predominately Latino neighborhoods.

---

[5] FBI, Crime in the United States 2010, North Carolina: Full-time Law Enforcement Employees, Table 80, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/table-80/10tbl80nc.xls (last visited Feb. 23, 2012).
[6] *Id.*

*Third, and again at the direction of Sheriff Johnson, ACSO checkpoint practices discriminate against Latinos.* Deputies single out Latino drivers for arrest at checkpoints, even for minor traffic violations. Similarly situated non-Latino drivers are often waved through the checkpoints without providing identification. We also find that when ACSO deputies stop drivers for minor traffic offenses, whether at a checkpoint or when conducting routine traffic stops, the way ACSO treats drivers depends on the driver's ethnicity. Specifically, we find that when stopped for minor traffic offenses, ACSO deputies arrest rather than merely cite Latino drivers, but not drivers of other ethnicities. Indeed, Sheriff Johnson has directed his supervisory officers to tell their subordinates, "If you stop a Mexican, don't write a citation, arrest him." Non-Latino drivers, when stopped, are issued citations but not arrested for the same types of minor traffic violations. In one instance, a Latino man and a white woman were stopped by the same deputy, on the same day, for the same offense, and the deputy arrested the Latino man but only gave the white woman a written citation.

*Fourth, ACSO discriminates against Latinos in its jail booking and detention procedures.* Our investigation revealed that correctional officers verify the immigration status of all detainees who "appear" Latino, regardless of their response to citizenship questions. Officers decide which detainees to interview based on assumptions about nationality and ethnicity. Those who appear "American" are not interviewed, even if they cannot produce identification. Further, law enforcement detains Latinos for immigration status checks even after bond has been posted. Our interviews confirmed that in at least some cases, Latino individuals who had posted bond were informed they would not be released because of a U.S. Immigration and Customs Enforcement ("ICE") detainer, even though ICE had not yet been contacted and no detainer had been issued.

*Fifth, the Sheriff directs his deputies to target predominantly Latino neighborhoods for increased enforcement based on the Sheriff's often-stated belief that Latinos are responsible for Alamance County's drug trade.* For example, at a staff meeting Sheriff Johnson stated, "We've had a big drop in the Hispanic population, but we still got a lot dealing dope and we still got a lot of citizens in this country dealing dope with them." Accordingly, he directed his Vice/Special Operations Unit to target three or four predominately Latino mobile home parks and neighborhoods. As he described these heightened enforcement efforts in predominantly Latino areas, Sheriff Johnson stated, "Hell will come to these places and the devil gonna come with him. And you folks [the Special Ops Unit] gonna be the devil."

*Sixth, ACSO's discriminatory practices undermine its ability to serve and protect Alamance County's Latino residents and the community at large.* Effective policing is largely built on a relationship of trust with all segments of the community. ACSO has done almost nothing to build such a relationship with the County's Latino residents, and much to destroy it. Our interviews with ACSO officers and community members reveal that the absence of this trust has substantially compromised policing by limiting the willingness of witnesses and victims to report crimes and speak to ACSO deputies about criminal activity or complaints of misconduct by ACSO officers. Our investigation finds that Latinos are afraid to call the police to report crimes and provide information pertinent to solving crimes.

## B. Discriminatory Bias

A culture of discrimination against Latinos pervades ACSO. The Sheriff and the highest levels of command staff support and foster this culture of bias. Sheriff Johnson has made numerous statements, both in public and to his deputies and command staff, exhibiting his bias against Latinos.

The Sheriff's statements frequently assume that Latinos in Alamance County are undocumented immigrants and are involved in criminal activity. For example, in one widely publicized statement, in the course of discussing undocumented immigrants, Sheriff Johnson suggested that anyone of Mexican national origin was inherently suspicious, saying: "Their values are a lot different – their morals – than what we have here. In Mexico, there's nothing wrong with having sex with a 12-, 13- year old girl . . . . They do a lot of drinking down in Mexico."[7] The Sheriff also uses derogatory epithets – such as the phrase "taco eaters" – when referring to Latinos in speaking with his staff, and his command staff tolerates the use of derogatory racial and ethnic epithets by ACSO deputies and correctional officers.

Further, the Sheriff and other ACSO command staff have explicitly directed deputies to target Latinos during enforcement actions. For instance, the Sheriff has instructed his officers to arrest all Latinos who commit the traffic infraction of driving without a license. Based on such directives, ACSO deputies understand that they should target Latinos with their discretionary enforcement actions and bring them into the Alamance County Jail to be run through immigration databases,[8] rather than simply issuing them citations.

## C. Departures from Policing Standards and Procedures

ACSO has departed from state law and policing standards in ways that have adversely affected Latinos and contribute to violations of constitutional and federal rights. First, ACSO does not comply with state law, standard policing practices, and its own policies concerning the documentation of vehicle checkpoints and traffic stops. Deputies often disregard ACSO's policy requiring them to file an action plan and obtain supervisory approval prior to setting up a vehicle checkpoint and to complete a report following each checkpoint. In addition, ACSO has "grossly underreported" the number of traffic stops its deputies made,[9] even though the collection of traffic stop data is required by North Carolina law.[10] Because it lacks vehicle checkpoint and traffic stop data, ACSO cannot properly monitor its deputies' traffic enforcement activity or

[7] Kristin Collins, *Sheriffs Help Feds Deport Illegal Aliens*, The News and Observer, Apr. 22, 2007, at A1, http://www.newsobserver.com/2007/04/22/59984/sheriffs-help-feds-deport-illegal.html.
[8] In 2007, ACSO entered into a Memorandum of Agreement ("MOA") with U.S. Immigration and Customs Enforcement pursuant to 8 U.S.C. § 1357(g). This MOA permits designated and trained ACSO officers to investigate individuals detained at the Alamance County Jail for immigration violations. The MOA prohibits ACSO from conducting immigration checks on individuals outside of the jail setting.
[9] Robert Boyer, *Hispanics Stopped by Sheriff's Department "Grossly Underreported,"* The Burlington Times-News, Apr. 7, 2009.
[10] N.C. Stat. Ann. § 114-10.01 (effective Jan. 1, 2002, amended effective Jan. 1, 2010).

reasonably determine whether or not deputies or units engage in racial profiling. Additionally, the number of Latinos booked into jail for minor offenses is masked because under ACSO policy minor traffic offenses are logged into a book and detainees are listed only as either "b[lack]" or "w[hite]."

Second, ACSO's Special Operations Unit[11] does not adhere to record keeping requirements or other standard policing practices. The Unit performs traffic enforcement and other special operations prioritized by the Sheriff. These officers, hand-picked by and loyal to the Sheriff, perform most of the County's traffic stops and target predominantly Latino neighborhoods with road blocks, vehicle stops, raids, and increased patrols at the direction of Sheriff Johnson, but with little oversight. These deputies often do not fill out required documentation of enforcement actions, limiting oversight of their activities. Additionally, members of the Unit are inconsistently disciplined for misconduct.

## LEGAL DISCUSSION

Section 14141 grants the United States authority to sue a state or local government for equitable and declaratory relief when a "governmental authority . . . engage[s] in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 42 U.S.C. § 14141. Both the Constitution and federal law prohibit intentional discrimination on the basis of race, color, or national origin. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance." 42 U.S.C. § 2000d. In addition, the Title VI implementing regulations ban recipients of federal funds from engaging in activities that have a discriminatory effect on the basis of race, color, or national origin.

While ACSO should establish its own enforcement priorities, ACSO's actions must comply with the Constitution and laws of the United States. We find that, by intentionally targeting Latinos, ignoring basic law enforcement protocols, and failing to implement meaningful safeguards against discriminatory police practices, ACSO engages in intentional discrimination in violation of the Fourteenth Amendment, Fourth Amendment, and federal law. We further find that ACSO's enforcement activities have a discriminatory effect on Latinos in Alamance County in violation of DOJ's regulations implementing Title VI.

### A. Discriminatory Policing

Our investigation provides reasonable cause to believe that ACSO's discriminatory traffic enforcement and vehicle checkpoint activities violate the Equal Protection Clause of the Fourteenth Amendment, Title VI, and Title VI's implementing regulations.

The Equal Protection Clause prohibits certain law enforcement practices that discriminate based on race, ethnicity, or national origin. *Whren v. United States*, 517 U.S. 806, 813 (1996). A law enforcement agency like ACSO violates the Equal Protection Clause when its decision

---

[11] This unit has gone by different names, including "Vice" and "Street Crimes," throughout its existence.

maker adopts a facially neutral policy or practice with a discriminatory intent and that policy or practice has a discriminatory effect. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Washington v. Davis*, 426 U.S. 229, 239-40 (1976); *Monroe v. City of Charlottesville*, 579 F.3d 380, 388 (4th Cir. 2009). Likewise, law enforcement officers violate the Equal Protection Clause when they administer or enforce a facially neutral policy in a manner that disproportionately affects a protected group and they act with discriminatory intent. *Monroe*, 579 F.3d at 388.

A law enforcement activity may run afoul of the Equal Protection Clause even where discriminatory intent is not the decision maker's sole motive. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982); *Orgain v. City of Salisbury*, 305 F. App'x 90, 98 (4th Cir. 2008) ("Notably, the Equal Protection Clause does not require Plaintiffs to prove that the challenged action rested solely on racially discriminatory purposes."). Rather, an equal protection violation occurs when evidence shows that "racial animus was one of several factors that, taken together," motivated the discriminatory acts. *Orgain*, 305 F. App'x at 98; *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). To assess whether intentional discrimination animates a law enforcement activity, courts examine the totality of the circumstances with particular attention to factors the Supreme Court has identified as most probative of discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Those factors include: evidence of discriminatory effect; evidence of departures from normal procedures; the specific sequence of events that led to the discriminatory practices at issue; and contemporaneous statements from a decision maker that reveal a discriminatory intent. *Id.* at 266-68; *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995).

Our investigation revealed substantial evidence that Sheriff Johnson intentionally implemented law enforcement practices that discriminate against Latinos. While Sheriff Johnson often justifies ACSO's activities by citing his desire to combat illegal immigration, we conclude that anti-Latino bias motivates his selection and implementation of ACSO's enforcement priorities. Sheriff Johnson has made racially insensitive comments, tolerated racially derogatory remarks from ACSO command staff, and ordered various discriminatory enforcement activities. Indeed, Sheriff Johnson has ordered numerous vehicle checkpoints and other law enforcement activities in predominantly Latino neighborhoods, instructed ACSO officers to stop Latino drivers on roadways, and insisted that officers arrest and detain Latino drivers for minor offenses.

In addition to uncovering evidence of discriminatory intent, our investigation demonstrates that several ACSO practices result in a discriminatory impact on Latinos. Statistical evidence shows that ACSO deputies stop Latino drivers at higher rates than similarly situated non-Latinos on Alamance County roadways. This evidence not only demonstrates a disparate impact on Latino drivers, but also bears directly on the discriminatory motives of those implementing ACSO's traffic enforcement activities. It is difficult to conceive of any valid, non-discriminatory explanation for enforcement practices that are roughly four to ten times more likely to stop Latino drivers than non-Latino drivers. This statistical evidence is consistent with what witnesses have told us about ACSO deputies – in particular ACSO Special Operations – frequently seizing and detaining Latino drivers without cause.

Moreover, analysis of the traffic checkpoints ACSO conducted and documented from 2007-2011 demonstrates that ACSO disproportionately locates checkpoints in or near predominately Latino communities. Interviews with County residents confirm that these discriminatory checkpoints continue today. Not only does ACSO frequently locate checkpoints in Latino areas, the results of our investigation indicate that ACSO officers execute checkpoints in a discriminatory manner. For these and other reasons, the evidence establishes that ACSO is engaged in a pattern or practice of equal protection violations.

Our investigation also provides reasonable cause to believe that ACSO's discriminatory jail practices violate the Equal Protection Clause. ACSO's jail procedures unlawfully target Latinos for immigration status checks during booking and detention.

Discriminatory law enforcement activities are also prohibited by Title VI. Title VI establishes that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance." 42 U.S.C. § 2000d. In addition, the regulations implementing Title VI proscribe "criteria or methods of administration" that exert a discriminatory effect on the basis of race, color, or national origin. 28 C.F.R. § 42.104(b)(2). ASCO and Alamance County receive federal funding and have violated Title VI and its implementing regulations for the reasons detailed above.

## B. Unreasonable Seizures

ACSO deprives Latino residents of their Fourth Amendment right to be free of "unreasonable searches and seizures." U.S. Const. Amend. IV. Even the temporary detention of an individual by police during a traffic stop for a limited purpose constitutes a seizure for Fourth Amendment purposes. *Whren*, 517 U.S. at 809-10; *United States v. Branch*, 537 F.3d 328, 334 (4th Cir. 2008). A traffic stop must thus be "reasonable" under the circumstances. *Whren*, 517 U.S. at 810. Roving checkpoints for license and registration checks are not permissible. *Delaware v. Prouse*, 440 U.S. 648, 657, 661 (1979). Stopping a vehicle at a police checkpoint likewise constitutes a seizure within the meaning of the Fourth Amendment. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990). While the Fourth Amendment allows vehicle checkpoints in certain narrow circumstances, *see Sitz*, 496 U.S. at 454 (upholding sobriety checkpoint), police may not utilize checkpoints to pursue general law enforcement goals, such as immigration sweeps or drug interdiction. Nor can officers inoculate an impermissible vehicle checkpoint by articulating a pretextual justification. *See, e.g., United States v. Huguenin*, 154 F.3d 547, 555 (6th Cir. 1998) (pretextual checkpoints must be judged by true programmatic purpose); *United States v. Morales-Zamora*, 974 F.2d 149, 153 (10th Cir. 1992) (reversing denial of suppression motion and holding that a driver's license checkpoint was in fact a pretext for drug searches).

Our investigation furnishes reasonable cause to believe that ACSO's practice of targeting Latino drivers via traffic enforcement and vehicle checkpoints violates the Fourth Amendment. These racially motivated stops are unreasonable under the Fourth Amendment. As described above, ACSO locates checkpoints in heavily Latino areas to facilitate impermissible programmatic objectives, including de facto immigration sweeps and drug interdiction. ACSO officers likewise engage in a practice of stopping Latino drivers on Alamance County roadways

regardless of whether reasonable suspicion exists for the stops – a practice that contravenes the "reasonableness" the Fourth Amendment prescribes. Further, ACSO unjustifiably detains Latinos after they have posted bail.

## REMEDIAL MEASURES

The factual findings detailed above provide reasonable cause to believe that ACSO violates the Fourth and Fourteenth Amendments to the United States Constitution, Section 14141, Title VI, and Title VI's implementing regulations. The Civil Rights Division accordingly notifies you that, absent ACSO reaching an agreement with the Division to correct these violations, the United States will initiate litigation to compel compliance with the Constitution and federal law.

The constitutional violations and institutional deficiencies outlined above are the product of an ingrained culture that encourages and tolerates the discriminatory treatment of Latinos and an agency that has demonstrated its flagrant disregard for constitutional protections. Reform will require sustained commitment to long-term structural, cultural, and institutional change, including the following:

- Elimination of Overt Discrimination: ACSO must develop and implement policies prohibiting discriminatory enforcement activities and the use of derogatory language aimed at racial and ethnic groups by ACSO officers while on duty.

- Training for ACSO Deputies, Supervisors, and Command Staff: ACSO must develop and implement effective and meaningful training for its officers and relevant non-sworn staff in constitutional policing, including how to perform stops, searches, seizures, and arrests consistent with the requirements of the Fourth and Fourteenth Amendments. Training must also include instruction regarding language access obligations and procedures.

- Special Operations Unit: ACSO must develop and implement detailed policies, procedures, training, and oversight regarding the operations and activities of the Special Operations Unit.

- Data Collection, Analysis, and Risk Management: ACSO must develop, implement, and enforce a comprehensive and accurate data collection system documenting all ACSO enforcement activity. Such a program requires consistently completed, detailed auditable reports for vehicle checkpoints; traffic and pedestrian stops; searches and seizures; raids; and patrol activities. This program also requires regular analysis and audits of the data to enable ACSO to supervise, manage, and intervene when appropriate.

- Complaint System and Internal Affairs: ACSO must develop and implement a comprehensive complaint, investigation, and disciplinary system to enable it to hold officers accountable when they violate policy or the law. The complaint system must be well-publicized and accessible to all community members. It must permit members of

the public, including ACSO officers, to make complaints against ACSO staff and deputies without fear of retaliation. The internal investigative process must include clear avenues for adjudication, discipline, and criminal prosecution, if necessary.

- Community Outreach: ACSO must meet the law enforcement needs of all its residents, regardless of their race or ethnicity. To that end, ACSO must engage with and reach out to ACSO's Latino residents to ensure that it is fairly and effectively providing them with law enforcement services.

## THE ROAD AHEAD

We strongly believe that effective policing and constitutional policing are inseparable. We prefer to work collaboratively with law enforcement agencies, as we have in recent years – increasingly at their request – to address serious concerns that threaten to undermine public confidence and hinder effective policing. We prefer negotiation rather than litigation. Our goal throughout every investigation is to work cooperatively to develop and implement sustainable reform measures that will reduce crime, ensure respect for the Constitution, and increase public confidence in law enforcement.

We stand ready to roll up our sleeves and work with you to address the concerns outlined in this letter. We remain prepared to take prompt, appropriate legal action if you choose to forego collaboration. We look forward to hearing from you by September 30th as to whether you wish to seek a negotiated resolution of this matter. Please note that this letter is a public document and will be posted on the Civil Rights Division's website. If you have any questions, please contact Jonathan Smith, Chief of the Special Litigation Section, at (202) 514-6255.

Sincerely,

Thomas E. Perez
Assistant Attorney General